ORIGINAL

## CRIMINAL COMPLAINT

AO 91 (Rev. 11/82)

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>GAYLE GARCIA SIMPSON | DOCKET NO.<br><br>FILED<br>CLERK, U.S. DISTRICT COURT<br>AUG – 9 2017<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY ___ DEPUTY |
|---|---|
| | MAGISTRATE'S CASE NO.<br>17MJ 02020 |

Complaint for violation of Title 18, United States Code, Sections 545, 2(b) (unlawfully importing, and willfully causing the unlawful importation of, merchandise into the United States contrary to law)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE ALKA SAGAR | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>April 12, 2017 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN)<br>435 East 99th Street, Inglewood, CA 90301 |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

### [18 U.S.C. §§ 545, 2(b)]

On or about April 12, 2017, in the County of Los Angeles, within the Central District of California, and elsewhere, defendant GAYLE GARCIA SIMPSON knowingly and fraudulently, imported and brought, and caused to be imported and brought, merchandise, namely five monitor lizards (*Varanus nuchalis, Varanus cumingi,* and *Varanus palawanensis*), into the United States contrary to law, that is: (1) without reporting or declaring said monitor lizards to the United States Fish and Wildlife Service, in violation of Title 50, Code of Federal Regulations, Section 14.61; and (2) without obtaining the necessary documents under the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), in violation of the Endangered Species Act, Title 16, United States Code, Sections 1538(c) and 1540(b), and CITES, Title 50, Code of Federal Regulations, Sections 23.13(a) and 23.20(e).

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**JUAN RAMIREZ AMEZCUA**<br><br>OFFICIAL TITLE<br>SA, U.S. Fish and Wildlife Service |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE<br>August 9, 2017 |
|---|---|

**ALKA SAGAR**

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA Erik Silber x12231 REC: bond

### AFFIDAVIT

I, Juan Ramirez Amezcua ("Ramirez"), being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the Department of the Interior, United States Fish and Wildlife Service ("USFWS"), Office of Law Enforcement ("OLE"), stationed in Torrance, California.  I am authorized by the Secretary of the Interior to conduct searches and seizures and to make arrests, as authorized by law, pursuant to the Lacey Act, Title 16, United States Code, Section 3371 et seq.  I am an investigative law enforcement officer of the United States within meaning of Title 16, United States Code, Section 3375, and a federal law enforcement officer within the meaning of Rule 41(a) of the Federal Rules of Criminal Procedure.  I have been employed by the USFWS as a SA since March of 2016.  I am currently assigned to the USFWS Office in Torrance, California, which investigates wildlife trafficking crimes, including the unlawful importation and exportation of wildlife.  I attended the Federal Law Enforcement Training Center Criminal Investigator Training Program ("CITP") Academy and USFWS Special Agent Basic School ("SABS") from March of 2016 through July of 2016.  My training at CITP and SABS

1

included classes with a focus on smuggling of live wildlife and wildlife products.

2.     My experience is based on my training as a Wildlife Inspector when I was employed by the USFWS Office of Law Enforcement in the Torrance, California office for the Port of Los Angeles from August of 2009 to March of 2016.  As such, I have participated in and have assisted in investigations relating to wildlife trafficking crimes, specifically smuggling.  My training and experience in wildlife trafficking crimes have included the regulation of importation and exportation of federally protected wildlife, and includes investigating individuals who participate in the commercial importation and exportation of wildlife.  This experience as a Wildlife Inspector has put me in contact with individuals who are involved in the wildlife pet trade.

## II.  PURPOSE OF AFFIDAVIT

3.     This affidavit is made in support of an arrest warrant and criminal complaint charging GAYLE GARCIA SIMPSON (SIMPSON") with fraudulently or knowingly importing merchandise into the United States contrary to law in violation of Title 18, United States Code, Section 545.

4.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and/or

2

information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and/or in part only.

## III. APPLICABLE LAW

5.  The Endangered Species Act ("ESA") is a federal law that, among other things, regulates the importation and exportation of certain wildlife and plants to and from the United States, and implements the United States' obligations under the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES").

6.  CITES is an international agreement among approximately 183 nations, including the United States and Philippines, that establishes certain requirements that must be met before CITES-protected wildlife may be imported or exported from signatory nations.  Wildlife protected under CITES is divided into Appendices I, II, and III.  Wildlife listed in Appendix I have the highest level of protection and include those species threatened with the immediate risk of extinction.  Title 50, Code of Federal Regulations, Section 23.13 generally

3

provides that it is unlawful for any person subject to the jurisdiction of the United States to attempt to import or engage in international trade with, any specimen of a species listed in CITES Appendix I, II, and III.  All wildlife listed in Appendix I may only be legally imported into the United States or traded internationally when accompanied by a CITES permit issued by the United States and all Appendix II wildlife may only be imported into the United States when accompanied by an export permit or re-export certificate from the country of export.  50 C.F.R. §§ 23.20(e), 23.35, 23.36.

7.  All species of monitor lizards (Varanidae) are listed in CITES as Appendix I or II.  The species of monitor lizards at issue here includes: Varanus nuchalis, Varanus cumingi and Varanus palawanensis (all of which are listed on CITES Appendix II).  Additionally, one seized monitor lizard was identified as being a Varanus cumingi samerensis (listed on CITES Appendix II).[1]

8.  Title 16, United States Code, Sections 1538(c), 1540(b), provide criminal sanctions for any person to knowingly

_____

[1] I have learned via an open source web search that the samerensis monitor lizard has only recently been separated and elevated to the full species Varanus samerensis by the scientific community.  Although under CITES regulations the monitor lizard is listed as Varanus cumingi (CITES Appendix II), the scientific community and individuals who commercially deal in monitor lizards now trade the monitor lizard as Varanus samerensis.  Despite the change in terminology, that monitor lizard remains protected under CITES Appendix II.

engage in any trade in any specimens contrary to the provisions of CITES.

9.  Title 18, United States Code, Section 545 makes it unlawful for a person to "fraudulently or knowingly import[] or bring[] into the United States, any merchandise contrary to law, or receive[], conceal[], buy[], sell[], or in any manner facilitate[] the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law."

10. The Lacey Act, 16 U.S.C. § 3371, et seq., is a federal law that, among other things, makes it unlawful for any person to make or submit any false record, account, or label for, or any false identification of, any fish, wildlife, or plant which has been or is intended to be either imported or transported in interstate or foreign commerce.  16 U.S.C. §§ 3372(d), 3373(d).

11. Federal law generally provides that all importers of wildlife must file with the USFWS a completed Declaration for Importation or Exportation of Fish or Wildlife (Form 3-177), that is signed by the importer or the importer's agent, upon the importation of any wildlife at the place where USFWS clearance is requested.  See 50 CFR §§ 14.61 and 14.52.

## IV.   STATEMENT OF PROBABLE CAUSE

12.  On April 13, 2017, the Honorable Gail J. Standish, United States Magistrate Judge, issued an anticipatory search warrant based on an affidavit that I submitted.  I hereby incorporate the statements in that affidavit, which is attached as Exhibit 1, to support probable cause for the complaint and arrest warrant.  To summarize that affidavit, on April 12, 2017, while conducting a random inspection of United States Postal Service parcels, a United States Customs and Border Protection ("CBP") Officer x-rayed a parcel -- with airway bill EE514054651 arriving from the Philippines addressed to "Khayl Simpson" -- which revealed an image that indicated the presence of possible snakes.  A later USFWS inspection of the parcel revealed a stereo system which consisted of three speakers.  After the dismantling of each speaker, USFWS discovered five socks that were sealed with tape inside the speakers, each of which contained a monitor lizard (specifically, Varanidae monitor lizards listed on CITES Appendix II).  Two of the monitor lizards were dead and a third was injured.  I have attached as Exhibit 2 to this warrant additional photos of the monitor lizards in this case (different photos were also attached to the anticipatory search warrant affidavit).

6

## A. Executed Anticipatory Warrant

13. On April 14, 2017, United States Postal Service Inspector ("Inspector") Sumyra Duy, assigned to Los Angeles, attempted to deliver the parcel subject to the anticipatory search warrant using a ruse of dressing as a postal service courier as part of a controlled delivery (she was also fitted with an audio transmitter so agents could hear her communications). Prior to her attempted delivery, I had put the two dead monitor lizards back into the package and resealed it.

14. At approximately 11 a.m., Inspector Duy knocked on the front door, and was greeted by an adult Latino male who signed Inspector Duy's USPS delivery slip with the name "Gayle Simpson." From the audio transmission, I learned that, when Inspector Duy delivered the parcel, an adult male called for "Gayle" which was then followed by a child stating, "Dad, the package is here, the package" (Later, on April 14, 2017, I learned after conducting an interview of SIMPSON that the adult Latino was Sal Garcia, the brother of SIMPSON.)

15. Moments later, on April 14, 2017, a team of SAs and California Fish and Wildlife officers executed the anticipatory search warrant. USFWS Wildlife Inspectors ("WI") were also present to assist with the search of the residence and handling of wildlife. I was informed that, during the search, SAs and

7

WIs found six live monitor lizards within aquarium tanks, three shipping air waybills, miscellaneous business records, and USPS parcel with air waybill EE514054651 (the package subject to the controlled delivery), among other items.  The package from the controlled delivery was found in SIMPSON'S bedroom.  I have attached as Exhibit 3 a photo of one of the monitor lizards found during the search.

16. Also recovered during the search were a loaded AR-15 Colt rifle with the serial number obliterated, and two magazines, each with a 30-round capacity.  The Colt rifle was found during the search warrant with magazines inserted, which contained an unknown number of rounds.  A week later, on April 21, SA Diehl processed the Colt rifle and found that the magazines contained a total of 43 rounds.

B. Interview of SIMPSON

17. On the same date as the search warrant, USFWS SAs Laura Chee and I interviewed SIMPSON.  I advised SIMPSON of his Miranda rights and presented a Miranda waiver form for him to sign.  I told SIMPSON that the interview was voluntary and he did not have to speak with us.  SIMPSON told me that he wanted to speak with USFWS SAs and agreed to sign, and did sign, the Miranda waiver.  During the interview, SIMPSON said the following:

a.  SA Chee asked SIMPSON if he had any knowledge of the intercepted parcel.  Initially, SIMPSON stated that he did not know anything about the parcel, but did know a lot of "guys" in the Philippines.

b.  Later in the interview, SA Chee asked SIMPSON again, did you order the lizards?  SIMPSON responded with words to the effect of:  "Yeah, I told him I wanted them.  I told him I wanted them, yeah."  SA Chee asked SIMPSON how many monitor lizards he was expecting?  SIMPSON responded that he was expecting three or four.  SIMPSON then told the SAs that he paid about $2,000 or $3,000 United States dollars for each monitor lizard, and that he has had a relationship of 15 to 20 years with the Philippines supplier.

c.  SIMPSON then clarified that he paid the Philippines supplier about $4,000 United States dollars for the entire shipment, and that the monitor lizards retailed for about $1,000 United States dollars.  SA Chee then asked SIMPSON if he had ever sold any monitor lizards in the past.  SIMPSON responded that he has given several monitor lizards to friends as gifts, and that he has also sold a couple of monitor lizards to acquaintances.

d.  SIMPSON identified that the name on the package was his son's name, not his, although he identified that obviously his son had not ordered the package.

9

e.   SA Chee asked SIMPSON how the money was sent to the Philippines for the purchase of the monitor lizards.  SIMPSON responded that he sent the money to the Philippines via a Walmart wire transfer.  SA Chee asked SIMPSON when he first sent the Philippines supplier money.  SIMPSON stated that the first time he sent money to the supplier was approximately two years ago.  SA Chee asked SIMPSON how he met the supplier and SIMPSON responded that he met the supplier on Facebook. SIMPSON explained that initially he had small conversations with the supplier, and eventually the relationship evolved into having conversations about the different species of monitor lizards in the Philippines and the specific islands that they occur on.

f.   SA Chee asked SIMPSON if he had CITES permits for the monitor lizards.  SIMPSON responded that CITES permits were not needed because they are not listed as Appendix I.  SIMPSON stated that only some monitor lizards require CITES permits, such as grays monitor lizards from the Philippines (Varanus olivaceus- listed as CITES Appendix II) and rock monitor lizards from Afghanistan (Varanus bengalensis- listed as CITES Appendix I).

18. Based on my training and experience (and information provided to me by other experienced USFWS agents with whom I work), I know that wildlife smugglers conceal wildlife in

shipments to evade law enforcement detection and they do so because they know that their conduct is illegal.  Here, the monitor lizards were hidden in speakers, the package had a false description (listing only speakers), the package was delivered in a false name (SIMPSON'S son's name), and SIMPSON initially falsely denied bringing the monitor lizards into the United States when interviewed.  I, therefore, believe that SIMPSON knew that it was not lawful to bring the monitor lizards into the United States despite his statement that he did not think he needed a CITES permit.

## V. CONCLUSION

19.   Based on the foregoing facts, I believe there is probable cause to charge GAYLE GARCIA SIMPSON with, an arrest him for, fraudulently or knowingly importing merchandise into the United States contrary to law in violation of Title 18, United States Code, Section 545.

_____
Juan Ramirez Amezcua, Special
Agent, USFWS

Subscribed to and sworn before me
this 9th day of August 2017.

_____
HONORABLE ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE

**ALKA SAGAR**

12

# EXHIBIT 1

ORIGINAL

AO93
(Rev.8/82)

## ANTICIPATORY SEARCH WARRANT ON WRITTEN AFFIDAVIT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

**UNITED STATES OF AMERICA**
v.

DOCKET NO.   **17-0823M**   MAGISTRATE'S CASE NO.

**THE PREMISES KNOWN AS:**
Location in which visual surveillance indicates the
United States Postal Service package with tracking
Number EE514054651PH has been accepted for
delivery at 435 East 99TH St., Inglewood, CA 90301

**TO:**
ANY SPECIAL AGENT(S) WITH THE UNITED
STATES FISH AND WILDLIFE SERVICE OR
ANY OTHER AUTHORIZED OFFICER

Affidavit having been made before me by the below-named affiant that he/she has reason to believe that
on the premises known as

### SEE ATTACHMENT A

in the Central District of California

there will be concealed certain property, namely:

### SEE ATTACHMENT B

and as I am satisfied that there is probable cause to believe that <u>upon the occurrence of the triggering
event described in Section VI of the search warrant affidavit,</u> the property so described will be concealed
on the person or premises above-described and the grounds for application for issuance of the search
warrant exist as stated in the supporting affidavit which is incorporated herein by reference and attached
hereto.

**YOU ARE HEREBY COMMANDED** to search on or before _____ <u>fourteen (14) days</u> _____
(not to exceed 14 days) the person or place named above for the property specified, serving this warrant
and making the search at any time in the day or night <u>upon the occurrence of the event described above,</u>
and if the property be found there to seize it, leaving a copy of this warrant and receipt for the property
taken, and prepare a written inventory of the property seized and promptly return this warrant to <u>the
duty U.S. Magistrate Judge</u> as required by law.

| NAME OF AFFIANT | SIGNATURE U.S. MAGISTRATE JUDGE** | DATE/TIME ISSUED |
|---|---|---|
| **Juan Ramirez Amezcua, United States Fish and Wildlife Service** | The Honorable Gail J. Standish | 4/13/17 @ 4:16 pm |

AUSA: Erik M. Silber

## ATTACHMENT A

### PREMISES TO BE SEARCHED

The SUBJECT PREMISES to be searched -- only after the event that triggers the anticipatory search warrant, i.e. delivery and acceptance of the United States Postal Service package bearing Tracking Number EE514054651PH and addressed to Khayl Simpson -- is located at 435 East 99TH St., Inglewood, CA 90301. It is a single story tan and blue/green colored house with a black shingled roof. It has a one-car light blue garage and enclosed by a fence constructed from brick and iron with an iron gate that leads to a front door. The garage is on the right side of the house.

i

ATTACHMENT B

ITEMS TO BE SEIZED

1.    The items to be seized from 435 East 99TH St., Inglewood, CA 90301 (the "SUBJECT PREMISES") constitute evidence, fruits, and/or instrumentalities of violations of 16 U.S.C. §§ 1538(c), 1540(b), 50 C.F.R. §§ 23.13, 23.20 (illegally importing legally-protected animals); 16 U.S.C. §§ 3372(d), 3373(d)(3)(A)(i) (submitting a false record or label for wildlife intended to be imported); and 18 U.S.C. § 545 (smuggling goods into the United States), namely:

a.    A United States Postal Service package with Tracking number EE514054651PH and addressed to Khayl Simpson at 435 East 99Th St., Inglewood, Ca 90301 and its contents, including Convention on the International Trade in Endangered Species of Wild Fauna and Flora ("CITES") protected wildlife.

b.    Any other CITES-protected wildlife.

c.    Records relating to the purchase, importation, transportation, storage, possession, transfer, disposition, trade, sale, offer to purchase, or offer for sale of CITES-protected wildlife; and

d.    Records and documents reflecting communications with government agencies, consumer associations, and business associations about CITES-protected wildlife, or the requirements for the importation or exportation of wildlife under CITES.

ii

[Non-Instrumentality Protocol]

e.  With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.  evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.  passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and

iii

[Non-Instrumentality Protocol]

manuals, that may be necessary to access the device or to conduct a forensic examination of it;

        viii.    records of or information about Internet Protocol addresses used by the device;

        ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

    3.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related

[Non-Instrumentality Protocol]

communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## IX.   SEARCH PROCEDURE FOR DIGITAL DEVICES

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) beyond this 120-day period without first obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of

v

[Non-Instrumentality Protocol]

the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

      ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

      iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

      c.  If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

      d.  If the search determines that a digital device does not contain any data falling within the list of items to be

<div align="center">vi</div>

[Non-Instrumentality Protocol]

seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the digital device but may not access data falling outside the scope of the items to be seized (after the time for searching the device has expired) absent further court order.

g. The government may retain a digital device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending). Otherwise, the government must return the device.

h. After the completion of the search of the digital devices, the government shall not access digital data falling

vii

[Non-Instrumentality Protocol]

outside the scope of the items to be seized absent further order of the Court.

5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

[Non-Instrumentality Protocol]

g.   Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

ix

[Non-Instrumentality Protocol]

## AFFIDAVIT

I, Juan Ramirez Amezcua, being duly sworn, declare and state as follows:

### I. INTRODUCTION

1.   I am a Special Agent ("SA") of the United States Fish and Wildlife Service ("USFWS") within the Department of the Interior.  I have been so employed SA since March of 2016.  I am currently assigned to the USFWS Office in Torrance, California, which investigates wildlife trafficking crimes, including the unlawful importation and exportation of wildlife.  I attended the Federal Law Enforcement Training Center Criminal Investigator Training Program ("CITP") Academy and FWS Special Agent Basic School ("SABS") from March of 2016 through July of 2016.  My training at CITP and SABS included classes with a focus on smuggling of wildlife.

2.   My training and experience also comes from being a Wildlife Inspector when I was employed by the USFWS Office of Law Enforcement in the Torrance, California office for the Port of Los Angeles from August of 2009 to March of 2016.  As such, I have participated in and have assisted in investigations relating to wildlife trafficking crimes, specifically smuggling.  My training and experience in wildlife trafficking crimes have included the regulation of importation and exportation of

federally protected wildlife, and investigating individuals who participate in the commercial importing and exporting of wildlife.

## II. PURPOSE OF THIS AFFIDAVIT

3.   This affidavit is made in support of an application for an anticipatory search warrant for the premises located at 435 E. 99th St., Inglewood, CA 90301 (the "SUBJECT PREMISES") for evidence, fruits, and/or instrumentalities of violations of 16 U.S.C. §§ 1538(c), 1540(b), 50 C.F.R. §§ 23.13, 23.20 (illegally importing legally-protected animals); 16 U.S.C. §§ 3372(d), 3373(d)(3)(A)(i) (submitting a false record or label for wildlife intended to be imported); and 18 U.S.C. § 545 (smuggling goods into the United States).  This anticipatory search warrant will be executed only upon the receipt of the United States Postal Service parcel described below by an individual at the SUBJECT PREMISES and the occurrence of the circumstances described in Section VI of this affidavit.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and/or information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation

2

[Non-Instrumentality Protocol]

into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. PREMISES TO BE SEARCHED AND ITEMS TO BE SEIZED

5.   The SUBJECT PREMISES is located at "435 EAST 99th St. INGLEWOOD CA 90301 USA", and is described in detail in Attachment A, which is incorporated herein by reference.

6.   The items to be seized, which constitute evidence, fruits, and/or instrumentalities, of violations of 16 U.S.C. §§ 1538(c), 1540(b); 50 C.F.R. §§ 23.13, 23.20 (illegally importing legally-protected animals), 16 U.S.C. §§ 3372(d), 3373(d)(3)(A)(i) (submitting a false record or label for wildlife intended to be imported), and 18 U.S.C. § 545 (smuggling goods into the United States), are listed in Attachment B, which is incorporated herein by reference.

## IV. APPLICABLE LAW

7.   The Endangered Species Act is a federal law that, among other things, regulates the importation and exportation of certain wildlife and plants to and from the United States, and implements the United States' obligations under the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES").

3

[Non-Instrumentality Protocol]

8.   CITES is an international treaty among approximately 183 nations, including the United States and the Philippines, that establishes certain requirements that must be met before CITES-protected wildlife may be imported or exported from signatory nations.   Wildlife protected under CITES is divided into Appendices I, II, and III.   Wildlife listed in Appendix I have the highest level of protection and include those species threatened with the immediate risk of extinction.   Wildlife listed in Appendix II are considered at risk for becoming endangered and require permits for import.

9.   Title 50, Code of Federal Regulations, Section 23.13 generally provides that it is unlawful for any person subject to the jurisdiction of the United States to attempt to import or engage in international trade with, any specimen of a species listed in CITES Appendix I, II, and III.   All wildlife listed in Appendix I may only be legally imported into the United States when accompanied by a CITES import permit issued by the United States and a CITES export permit or re-export certificate issued by the country from which the wildlife is exported.   All CITES Appendix II wildlife may only be imported into the United States when accompanied by an export permit or re-export certificate from the country from which the wildlife is being exported.   50 C.F.R. §§ 23.20(e), 23.35, 23.36.

4

10.  Monitor Lizards (Varanidae) are listed in CITES Appendix II.

11.  Title 16, United States Code, Sections 1538(c), 1540(b), provide criminal sanctions for any person who knowingly engages in any trade in any specimens contrary to the provisions of CITES.

12.  Title 18, United States Code, Section 545 makes it unlawful for a person to "fraudulently or knowingly import or bring into the United States, any merchandise contrary to law, or receive, conceal, buy, sell, or in any manner facilitate the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law."

13.  The Lacey Act, 16 U.S.C. § 3371, et seq., is a federal law that, among other things, makes it is unlawful for any person to make or submit any false record, account, or label for, or any false identification of, any fish, wildlife, or plant which has been or is intended to be either imported or transported in interstate or foreign commerce.  16 U.S.C. §§ 3372(d), 3373(d).

14.  Federal law generally provides that all importers of wildlife must file with the USFWS a completed Declaration for Importation or Exportation of Fish or Wildlife (Form 3-177), that is signed by the importer or the importer's agent, upon the

5

importation of any wildlife at the place where USFWS clearance is requested.   See 50 CFR §§ 14.61 and 14.52.

## V. STATEMENT OF PROBABLE CAUSE

15.   On April 12, 2017, I learned from USFWS SA Stephanie Johnson that she had received a call from USFWS SA Matt Martin, a Special Agent assigned to the USFWS Sacramento Office of Law Enforcement regarding an in-bound parcel from the Philippines that was intercepted at the United States Postal Service ("USPS") International Mail Facility ("IMF") in San Francisco. I was informed by SA Johnson that Customs and Border Protection ("CBP") officers found a parcel that they believed contained live snakes at the IMF.   CBP then notified the USFWS of the parcel for further investigation.   SA Johnson also informed me that the parcel contained a Philippine Post label with hand printed information for the recipient and sender.   The recipient was listed as "Khayl Simpson."   SA Johnson later received an email from USFWS Wildlife Inspector ("WI") Gabrielle Akiyama containing photos of the parcel label which she forwarded to me. The address of the recipient on the label was listed as "435 EAST 99TH ST. INGLEWOOD CA 90301 USA", with air waybill number EE 514 054 651 (the "SUBJECT PARCEL"), and a phone number of "4242550856."   The sender's address was listed as ""CHRISTIAN

6

AGUILAR" at "TABUNOK TALISAY CITY CEBU 6045."   The parcel contained a Customs declaration form that indicated the contents to be a "SPEAKERS", valued at $10,000.  The value declared was not specific as to being United States dollars or Philippines currency.

16.  That same day, April 12, 2017, WI Akiyama called me and stated that she went to the USPS IMF to retrieve that parcel.  WI Akiyama also informed me that CBP conducted a random inspection of USPS parcels, and x-rayed the subject parcel, and then notified the FWS via email that the parcel may contain snakes.  At the IMF, WI Akiyama received the parcel from CBP and returned with the parcel to the USFWS San Francisco office at "1633 Bayshore Hwy. #248 Burlingame California 94010" for processing.  After returning to the USFWS San Francisco office, WI Akiyama then transferred the parcel to SA John Pritting, a Special Agent assigned to the San Francisco Office of Law Enforcement for processing.  SA Martin was also present to assist with documenting and processing of the parcel.

17.  I was then informed by SA Pritting by telephone of the details of his inspection, which was photographed and sent to me via email.  SA Pritting opened the subject parcel and found it to contain a stereo system with a set of three speakers.  SA Pritting then detached the speakers from the stereo system and discovered five socks that were sealed with tape inside of the

7

[Non-Instrumentality Protocol]

speakers. SA Pritting then opened the socks and found each to contain a monitor lizard. Specifically, SA Pritting told me that, based on his experience as a game warden in California for four years -- where he saw monitor lizards as part of the pet trade -- the monitor lizards that were found were of the family Varanidae, which are listed in CITES Appendix II. SA Pritting informed me that he did not find any CITES documents, such as import or export permits or certificates, accompanying the subject parcel or inside the subject parcel. SA Pritting photographed his findings and then repackaged the parcel to its original condition for further law enforcement action. SA Pritting then told me that he was going to ship the parcel via FedEx to the USFWS Office of Law Enforcement in Los Angeles to be received by a special agent.

18.   On April 13, 2017, I received the FedEx package that contained the SUBJECT PARCEL that was shipped from the USFWS Office in Burlingame, CA. Upon receipt, I opened the SUBJECT PARCEL to further document and photograph the contents. While dismantling the speakers, I discovered five total monitor lizards, two of which were dead, and three that were still alive. While placing one of the three live lizards into a container of water for re-hydration, I saw that it appeared to have a shattered front leg. I have attached as Exhibit A a photograph of two of the monitor lizards as they arrived wrapped

[Non-Instrumentality Protocol]

in the socks and a photograph of the one of the monitor lizards with the sock removed.

19.   On April 12, 2017, USFWS SA Adam Diehl informed me that that day he searched in the TLO Trans-Union Intelligence ("TLO") database and learned that a Gayle Garcia SIMPSON is associated with the address "435 E. 99Th ST., Inglewood, California 90301", "the SUBJECT PREMISES." The TLO database contains records related to ownership and occupancy of property, personal identity, employment, vehicle registration, and other such records that are available with a subscription. A search of the name "Khayl Simpson" in the TLO database did not return as being associated with "the SUBJECT PREMISES." However, based on the similarities between the name "Khayl" and "Gayle", I believe this to be the same person.

20.   On April 12, 2017, SA Diehl informed me that that day he conducted a query of the Law Enforcement Management Information System ("LEMIS"), a database maintained by the USFWS. The query did not identify any Form 3-177 declaration for wildlife, any CITES import permit for monitor lizards, or any records for any shipments relating to SIMPSON. SA Diehl also requested from Law Enforcement CITES Clerk, Sealy Shephard, to conduct a query through the FWS Service Permit Issuance and Tracking System ("SPITS") for any wildlife records for SIMPSON. SPITS stores information including import/export license

9

[Non-Instrumentality Protocol]

applications, issued United States CITES permits, CITES permit applications, and other required permits to possess wildlife regulated by the FWS. A search of SPITS did not return any records for SIMPSON.

21. Based on my training and experience (and information provided to me by other experienced USFWS special agents with whom I work), I have learned that individuals who traffic in CITES-protected wildlife, such as here, also traffic in other types of CITES-protected wildlife. Thus, there is probable cause to believe that additional CITES-protected animals will be found at the SUBJECT PREMISES.

22. Based on my training and experience (and information provided to me by other experienced USFWS special agents with whom I work), I have learned that individuals who illegally import CITES-protected wildlife to their residences are likely to keep equipment, records, and/or correspondence related to illegal importations at their residence.

23. The package (SUBJECT PARCEL) that was intercepted on April 11, 2017, was being shipped from an overseas shipper in Phillipines. Based on my training and experience (and information provided to me by other experienced USFWS special agents with whom I work), I have learned that international trafficking of wildlife are often facilitated using e-mail and/or text messages and, thus, there is probable cause to

10

[Non-Instrumentality Protocol]

believe that digital evidence related to the unlawful wildlife trafficking in this case will be found at the SUBJECT PREMISES.

## VI. CIRCUMSTANCES THAT WILL ACTIVATE THE ANTICIPATORY SEARCH WARRANT FOR THE SUBJECT PREMISES

24. The anticipatory search warrant to search the SUBJECT PREMISES described herein will be triggered by the following circumstances:

a. Within the allowable time prescribed by the warrant, an individual working with law enforcement, acting in an undercover capacity as a USPS carrier, will deliver the SUBJECT PARCEL to the SUBJECT PREMISES.

b. It is anticipated that the SUBJECT PARCEL containing the wildlife will be accepted by an individual who is present at SUBJECT PREMISES and will be taken inside the SUBJECT PREMISES. The SUBJECT PARCEL will be kept under observation using physical surveillance until the time that it is taken into the residence. Once the SUBJECT PARCEL has been delivered and taken inside the SUBJECT PREMISES, USFWS SAs will wait between one to 30 minutes before entering the SUBJECT PREMISES. Thus, the triggering event to activate this anticipatory search warrant, and permit its execution, will be delivery and acceptance of the SUBJECT PARCEL; at the SUBJECT PREMISES.

[Non-Instrumentality Protocol]

## VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

25.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is

12

[Non-Instrumentality Protocol]

not always possible to search digital devices for digital data for a number of reasons, including the following:

    a.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

    b.   Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

    c.   The volume of data stored on many digital devices will typically be so large that it will be highly impractical to

13

[Non-Instrumentality Protocol]

search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to

14

[Non-Instrumentality Protocol]

a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

e. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for

15

[Non-Instrumentality Protocol]

by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

     f.   Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may

16

[Non-Instrumentality Protocol]

be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

g. Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using

17

[Non-Instrumentality Protocol]

steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

26. The USFWS has only five local agents and no local forensic examiners. On April 12, 2017, USFWS Torrance Office Resident Agent in Charge Erin Dean told me that she had attempted to contact USFWS digital forensic examiners, but was unable to find a digital forensic examiner to participate in the execution of the warrant on April 14, 2017, which is when the package is expected to be delivered. I know, including from different search warrants obtained and executed with similar circumstances, that we have a difficult time getting forensic assistance from other federal agencies on search warrants on short notice. I, thus, intend to seize digital devices during the execution of the search warrant and send them to our Digital Evidence Recovery and Technical Surveillance Unit located in Jacksonville, Florida, for imaging, and will promptly return the digital devices to residence.

[Non-Instrumentality Protocol]

27.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII. CONCLUSION

28.   For all the reasons described above, I respectfully submit that there is probable cause to believe that evidence,

[Non-Instrumentality Protocol]

fruits, and/or instrumentalities of violations of 16 U.S.C.

§§ 1538(c), 1540(b), 50 C.F.R. §§ 23.13, 23.20 (illegally

importing legally-protected animals); 16 U.S.C. §§ 3372(d),

3373(d)(3)(A)(i) (submitting a false record or label for

wildlife intended to be imported); and 18 U.S.C. § 545

(smuggling goods into the United States) will be found at the

SUBJECT PREMISES.


Juan Ramirez Amezcua, Special
Agent, USFWS


Subscribed to and sworn before me
this 13th day of April, 2017.


HONORABLE GAIL J. STANDISH
UNITED STATES MAGISTRATE JUDGE

20

[Non-Instrumentality Protocol]

# EXHIBIT A





04/13/2017 10:18

## EXHIBIT 2

A Monitor Lizard in a Sock (with the speaker shown)



One Monitor Lizard Removed from Sock (with speaker shown)



Monitor Lizard Found Dead Upon Inspection



<u>Exhibit 3</u>

One Large Monitor Lizard Found During Execution

of Search Warrant

